AUSA: Philip A. Ross                Telephone: (313) 226-9790

Special Agent     : Larissa Kramer (FBI)        Telephone: (313) 965-5509

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
### Eastern District of Michigan

| | |
|---|---|
| United States of America,<br><br>         Plaintiff,<br><br>v.<br>Ramasami Gunabalan, M.D.<br>a.k.a. Ram Gunabalan, M.D. | **Case:2:14-mj-30302**<br>**Judge: Unassigned,**<br>**Filed: 06-25-2014 At 04:05 PM**<br>**in re: Sealed Matter (krk)** |

      Defendant(s).

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief:

On or about the date(s) of _11/19/2010_ , in the county of _Oakland_
in the _Eastern_ District of _Michigan_ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347/1349 | Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Monetary Instruments |
| 18 U.S.C. § 482 | Forgery of a Venezuelan Bond |
| 21 U.S.C. § 331 | Alteration of Pharmaceuticals |

This criminal complaint is based on these facts:

See attached

☑    Continued on the attached sheet.

_____
*Complainant's signature*

Larissa Kramer, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _June 25, 2014_

_____
*Judge's signature*

City and state: _Detroit, Michigan_

Mona K. Mazjoub, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Larissa Kramer, being duly sworn, depose and say that I am a Special Agent with the Federal Bureau of Investigation (FBI), duly appointed according to law and acting as such, and have been employed as such since June 2006.   Prior to working for the FBI, I was a Border Patrol Agent where I engaged in interdiction of human smuggling and narcotics. As an FBI Special Agent, I am charged with investigating violations of federal statutes, and I have been assigned to investigate drug organizations, gangs, international terrorism, and healthcare fraud.   I am currently assigned to the Detroit office of the FBI, and my duties include investigating health care fraud and prescription drug diversion. I have consulted with agents and officers of numerous federal state, and local agencies in gaining an understanding of current trends in the diversion of prescription drugs and health care fraud. I am assigned to an investigation pertaining to health care fraud by AMERICAN WHOLESALE PHARMACEUTICALS (AMERICAN), RAMASAMI GUNABALAN M.D., also known as RAM GUNABALAN, RAYMOND ARIAS, and others not named.   The information herein is known to me through personal knowledge and investigation and/or from review of documents and interviews of people having direct knowledge of these events.   This affidavit does not include every fact that is known to me.

This affidavit is respectfully submitted in support of a complaint and arrest warrant for RAMASAMI GUNABALAN, date of birth (xx-xx-1943), who resides in Clarkston, Michigan, based on probable cause that RAMASAMI GUNABALAN M.D. conspired with RAYMOND ARIAS, and others to commit Health Care Fraud, in violation of Title 18 United States Code (USC) Sections 1347 and 1349, and Money Laundering, in violation of Title 18 USC Section 1956(h) and 1957.

The source of your affiant's information and the grounds for your affiant's

belief are as follows:

# BACKGROUND
## THE MEDICARE PROGRAM

1. The Medicare Program (Medicare) is the federal healthcare program for the aged and disabled established by Congress in 1965, as Title XVIII of the Social Security Act and codified at 42 U.S.C. § 1395. Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b). Medicare is administered through the Centers for Medicare and Medicaid Services (CMS). CMS is a division of the United States Department of Health and Human Services. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

2. Medicare includes coverage under two primary components, hospital insurance (Part A) and medical insurance (Part B). Part A covers physical therapy, occupational therapy, and skilled nursing services if a facility was certified by CMS as meeting certain requirements. Part B of the Medicare Program covers the cost of physicians, services and other ancillary services not covered by Part A.

3. Medicare Part D provides prescription drug coverage to persons who are eligible for Medicare. Under the program, eligible Medicare beneficiaries may enroll in a Medicare Prescription Drug Plan that adds prescription drug coverage to traditional Medicare. Alternatively, Medicare eligible beneficiaries may obtain prescription drug coverage by enrolling in a Medicare Advantage Plan under Part C of the Medicare program. Such Medicare Advantage Plans provide the full range of Medicare coverage to enrollees, including a prescription drug benefit under Medicare Part D.

2

4. Under Part D of the Medicare program, pharmacies enter into agreements, known as Retail Network Agreements, with the Medicare Prescription Drug Plans. Pursuant to these Retail Network Agreements, the pharmacies agree to, among other things, dispense prescription drugs in accordance with federal and state rules and regulations.

5. In order to be reimbursed for prescription drugs provided to Medicare beneficiaries, a pharmacy must obtain a prescription authorized by a physician or other qualified medical provider. Once a pharmacy obtains the prescription – either from the health care provider or from the beneficiary – the pharmacy submits a claim for the prescription drug to a Pharmacy Benefit Manager (PBM). PBMs are contracted by the Medicare Prescription Drug Plans – or in some cases are business units within the plans – to process claims for prescription drug benefits on behalf of the plans, in accordance with the requirements set forth by the plans.

6. Once the PBM approves the claim, a prescription drug "label" is printed by the pharmacy, and the prescription drug is dispensed to the Medicare beneficiary. Among other things, this label includes the name of the Medicare beneficiary, the drug dispensed, the lot number of the prescription drug dispensed, and the expiration date of the drug.

7. Later, the PBM pays the pharmacy for the claim for the prescription drug event, e.g. the dispensing of prescription drugs to a beneficiary, minus any co-pay to be paid by the Medicare beneficiary. The PBM, in turn, is reimbursed by the Medicare Prescription Drug Plan for those prescription drug claims.

8. Upon reason and belief, Medicare would not pay for diverted, misbranded, or

adulterated prescription drugs.

## **FOOD, DRUG, AND COSMETIC ACT**

9.  The United States Food and Drug Administration (FDA) is the federal agency charged with the responsibility of protecting the health and safety of the American public by enforcing the Food, Drug, and Cosmetic Act (FDCA). The FDA's responsibilities under the FDCA include regulating the manufacture, labeling, and distribution of all drugs and drug components shipped or received in interstate commerce.

10. Title 21, United States Code, Section 331(k), prohibits the alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

11. A prescription drug means a drug that, because of its toxicity and other potential harmful effects, is not safe for use except under the supervision of a practitioner licensed by law to administer the drug, or a drug which was limited by an approved application under Title 21, United States Code, Section 355 to use under the professional supervision of a practitioner licensed by law to administer such a drug.

12. Under the FDCA, each person who is engaged in the wholesale distribution of a prescription drug and who is not the manufacturer or an authorized distributor of record of such drug is required, before each distribution of such drug, to provide to the person who receives the drug a statement identifying each prior sale, purchase, or trade of such drug (including the date of the

transaction and the names and addresses of all parties to the transaction) (hereinafter a "drug pedigree statement").

13.  A drug pedigree statement is considered labeling for purposes of prescription drugs.

## SUMMARY

14. As set forth below, federal agents received information establishing that GUNABALAN laundered health care fraud proceeds for ARIAS from ELITE WELLNESS (ELITE) by accepting cash from ARIAS in exchange for checks drawn on GUNABALAN's business accounts.

15. As set forth below, federal agents received information establishing that GUNABALAN was an owner of AMERICAN WHOLESALE PHARMACEUTICALS (AMERICAN). AMERICAN distributed diverted, misbranded prescription drugs to Medicare participating pharmacies in Pennsylvania and Massachusetts. GUNABALAN, ARIAS, and others caused the pharmacies in Pennsylvania and Massachusetts to dispense diverted, misbranded drugs to Medicare beneficiaries, make claims to Medicare for the dispensed drugs, and receive reimbursement from Medicare for misbranded drugs.

5

## ELITE WELLNESS and CAREFIRST OCCUPATIONAL & REHAB

16. On March 31, 2009, ARIAS signed a MEDICARE PARTICIPATING PHYSICIAN OR SUPPLIER AGREEMENT, listing himself as "Owner" of ELITE.   ARIAS subsequently submitted, or caused to be submitted, this agreement to Medicare on behalf of ELITE, which enabled him to submit claims, for payment, to Medicare.   Between June 17, 2009 and October 26, 2009, ELITE submitted approximately $12,526,824.10 in claims to the Medicare program.   The majority of claims submitted to Medicare were for infusion therapy treatments which are used when a patient is unable to inject medications and requires injections of certain types of medications.

17. On December 23, 2009, EMELITZA ARIAS signed the Articles of Incorporation of CAREFIRST OCCUPATIONAL & REHAB (CAREFIRST), listing herself as the Registered Agent and sole Incorporator of CAREFIRST.   This form showed the address of the registered office to be 60 Putnam Avenue, Apt 2, Pontiac, Michigan.   This form also showed the purpose of the business to be engaged in the activity of "Physical Therapy." EMELITZA ARIAS subsequently submitted, or caused to be submitted, these Articles of Incorporation to the State of Michigan on behalf of CAREFIRST, in order to conduct business as a Domestic Profit Corporation.

18. On January 4, 2010, EMELITZA ARIAS signed a MEDICARE ENROLLMENT APPLICATION and a MEDICARE PARTICIPATING PHYSICIAN OR SUPPLIER AGREEMENT, listing herself as "Owner" of CAREFIRST.   EMELITZA ARIAS subsequently submitted, or caused to be submitted, this agreement to Medicare on behalf of CAREFIRST, which enabled her to submit claims, for payment, to Medicare

6

19. As a part of the fraud at ELITE, ARIAS offered to conceal Virgilio Adi Cordero-Quevedo, a federal fugitive, from law enforcement. In return, Cordero-Quevedo became the straw owner of ELITE. Once Cordero-Quevedo assumed responsibility for the claims submitted to Medicare, ARIAS caused the submission of over approximately $12,526,824.00 in fraudulent claims to Medicare for expensive infusion therapy treatments that were not rendered. Medicare paid ELITE approximately $3,840,877.03 for these fraudulent claims.

20. Prior to the sale of ELITE, there was a group of regular patients receiving infusion therapy treatment at ELITE. After Cordero-Quevedo took over as the straw owner of ELITE, ELITE billed for approximately 60 patients for infusion therapy treatments. However, ELITE was providing no treatment to any patients after the fictitious sale to Cordero-Quevedo. Between February 2009 and June 2011, ARIAS and his co-conspirators submitted claims to Medicare for expensive infusion therapy treatments which were never actually rendered.

21. Four Medicare infusion therapy patients from ELITE were brought over to CAREFIRST for treatment. The majority of the CAREFIRST patients were purported auto accident victims.

22. Billing data submitted by CAREFIRST shows no services billed prior to July 19, 2010. Between July 19, 2010 and June 13, 2011, CAREFIRST submitted approximately $1,000,077.94 in claims to the Medicare program. The majority of claims submitted to Medicare were for infusion therapy treatments which were never actually rendered

23. On October 17, 2012. ARIAS pleaded guilty to conspiracy to commit healthcare fraud at ELITE and CAREFIRST.

24. On October 9, 2012, EMELITZA ARIAS pled guilty to 18 USC 1349 conspiracy to commit healthcare fraud for activities at CAREFIRST.

## ARIAS AND GUNABALAN-Health Care Fraud

25. ARIAS was previously convicted in 1995 in the United States District Court for the Southern District of Florida for Conspiracy to Import Cocaine into the United States. During the time period of his association with GUNABALAN, your affiant received information that ARIAS was known to abuse cocaine.

26. Agents from the Federal Bureau of Investigation and Department of Health and Human Services Office of Inspector General interviewed a Cooperating Witness (CW) 1. CW1 stated that GUNABALAN provided $40,000 to ARIAS in order to start ELITE.

27. A review of financial records show a $40,000 check from MRI Consultants LLC, company incorporated by Gunabalan, to ELITE dated May 11, 2009. The memo line stated "Loan to Company."

28. Records obtained from the Michigan Secretary of State indicate that GUNABALAN signed the Articles of Incorporation of MRI Consultants LLC on November 2, 2001, listing himself as the Registered Agent and sole Incorporator of MRI Consultants. This form showed the address of the registered office to be GUNABALAN's home address, 4320 Newcastle Drive, Clarkston, Michigan. A search of property records confirm that GUNABALAN and his wife own 4320 Newcastle Drive, Clarkston, Michigan. In 2010, RALPH BINGGESER submitted a form listing himself as "CFO" and changing the registered address to 363 West Big Beaver, Suite 200, Troy, Michigan. Your affiant received information that GUNABALAN and some of his business entities utilize this address.

29. Agents from the Federal Bureau of Investigation and Department of Health and Human Services Office of Inspector General interviewed a Cooperating Witness (CW) 2. CW2 stated that GUNABALAN gave ARIAS an American Express credit card and a car to use. Financial records for American Express confirm that ARIAS had a credit card issued through GUNABALAN under MRI Consultants between March 2011 and July 2011. ARIAS made purchases of $58,915.13 using an American Express card on GUNABALAN's account. The bills were paid by electronic transfer from PET Consultants Huntington Bank Account #######4430.

30. Records obtained from the Michigan Secretary of State indicate that GUNABALAN is the current Registered Agent for PET Consultants, Inc. These records showed the address of the registered office to be GUNABALAN's home address, 4320 Newcastle, Clarkston, Michigan.

## ARIAS and GUNABALAN-STOLEN VENEZUELAN BOND

31. CW1 stated that ARIAS and GUNABALAN jointly held one or more $25,000,000.00 Venezuelan bearer bonds. The bearer bonds had reportedly been stolen from a Venezuelan bank by a Columbian drug cartel.

32. A review of financial records corroborated CW1 statement that GUNABALAN had a $25,000,000.00 Venezuelan bearer bond. In 2011, GUNABALAN provided the bearer bond to UBS Financial and attempted to use the bearer bond as collateral. In a document filed with UBS Financial, GUNABALAN listed a net worth of approximately $30,000,000.00.

9

## MONEY LAUNDERING

33. CW1 outlined a scheme for laundering the health care fraud proceeds from ELITE through bank accounts in Mexico and Panama. Once the fraud proceeds were wired to Mexico, United States currency was available in Miami, Florida and transported to Michigan.

34. CW2 stated that ARIAS told CW2 that he gave GUNABALAN cash from the proceeds of the illegal activity at ELITE. In exchange, GUNABALAN gave ARIAS checks to make the money look legitimate. GUNABALAN or his employees wrote the checks to EMELITZA ARIAS.

35. CW 2 stated that GUNABALAN became an investor in CAREFIRST. GUNABALAN and ARIAS had a partnership, whereby GUNABALAN received a percentage of the profits. In addition, CAREFIRST patients were referred to GUNABALAN's diagnostic imaging company for MRIs and testing. CAREFIRST transported patients to GUNABALAN's clinics. GUNABALAN also helped to fund the transportation side of CAREFIRST.

36. CW1 stated that GUNABALAN wrote checks to CAREFIRST which ARIAS described as kickbacks for the MRI referrals to GUNABALAN's diagnostic imaging company.

| From | Date | Amount | Signer | Memo |
|---|---|---|---|---|
| Medical Office Management Consultants | 4/6/2011 | $18,500.00 | BINGGESER | Loan to Comp |
| Bio Magnetic Resonance | 6/29/2011 | $14,100.00 | GUNABALAN | Loan to Comp |
| Bio Magnetic Resonance | 7/13/2011 | $30,000.00 | GUNABALAN | Loan to Comp |
| MRI Consultants | 7/7/27/2011 | $ 3,000.00 | BINGGESER | Loan to Comp |

37. Records obtained from the Michigan Secretary of State indicate that GUNABALAN is the current Registered Agent for Medical Office Management Consultants at 363 West Big Beaver, Suite 200, Troy, Michigan.

38. Records obtained from the Michigan Secretary of State indicate that GUNABALAN is the current Resident Agent of Bio Magnetic Resonance Inc at 4320 Newcastle Drive, Clarkston, Michigan.   In financial documents, GUNABALAN identified himself as the sole owner of Bio Magnetic Resonance.

39. Agents from the Federal Bureau of Investigation and Department of Health and Human Services Office of Inspector General interviewed a Cooperating Witness CW3. CW3 stated that ARIAS took him to see the CAREFIRST clinic. CW3 observed how easily the employees at CAREFIRST interacted with ARIAS. CW3 stated that the CAREFIRST employees acted like GUNABALAN was the owner.

40. A review of financial records for R. Gunabalan Inc Huntington Bank Account

#######2360 shows a series of checks from R. Gunabalan Inc to EMELITZA ARIAS. The checks were sequential and signed by GUNABALAN.

| To | From | Date | Number | Amount |
|----|------|------|--------|--------|
| E.A. | R.Gunabalan Inc. | 11/19/2010 | 1974 | $63,000.00 |
| E.A. | R.Gunabalan Inc. | 11/22/2010 | 1975 | $63,000.00 |
| E.A. | R.Gunabalan Inc. | 11/22/2010 | 1976 | $63,500.00 |
| E.A. | R.Gunabalan Inc. | 11/22/2010 | 1977 | $63,500.00 |
| TOTAL | | | | $250,000.00 |

41. CW2 stated that the checks were for the cash from ELITE that ARIAS gave to GUNABALAN.

42. On April 28, 1997, GUNABALAN signed the Articles of Incorporation of R. Gunabalan Inc, listing himself as the Registered Agent, President, and sole Incorporator of R. Gunabalan Inc.   This form showed the address of the registered office to be 4320 Newcastle, Clarkston, Michigan.

43. A review of financial records for PET Consultants Inc. Huntington Bank Account ######4430 show a series of checks from PET Consultants to EMELITZA ARIAS in her maiden name. The checks were signed by L.G., an employee of GUNABALAN at his R. Gunabalan Inc. office.

| To | From | Date | Check # | Amount |
|----|------|------|---------|--------|
| E.A. | PET Consultants | 7/1/2010 | 1604 | $10,522.17 |
| E.A. | PET Consultants | 8/1/2010 | 1605 | $10,522.17 |
| E.A. | PET Consultants | 9/10/2010 | 1606 | $10,522.17 |
| E.A. | PET Consultants | 10/1/2010 | 1607 | $10,522.17 |
| E.A. | PET Consultants | 11/1/2010 | 1608 | $7,911.32 |
| E.A. | PET Consultants | 1/14/2011 | 1684 | $35,000.00 |
| E.A. | PET Consultants | 1/28/2011 | 1685 | $50,000.00 |
| E.A. | PET Consultants | 2/25/2011 | 1691 | $75,000.00 |
| E.A. | PET Consultants | 3/15/2011 | 1699 | $40,000.00 |
| Total | | | | $250,000.00 |

13

44. A review of financial records for PET Consultants Inc. Huntington Bank
    Account #######4430 shows a series of checks from PET Consultants to
    CAREFIRST. The checks were signed by L.G., an employee of
    GUNABALAN at his R. Gunabalan Inc. office.

| To | From | Date | Check # | Amount |
|---|---|---|---|---|
| CAREFIRST | PET Consultants | 3/15/2011 | 1698 | $20,000.00 |
| CAREFIRST | PET Consultants | 4/13/2011 | 1712 | $3,300.00 |
| CAREFIRST | PET Consultants | 4/15/2011 | 1715 | $20,000.00 |
| CAREFIRST | PET Consultants | 4/29/2011 | 1727 | $24,000.00 |
| CAREFIRST | PET Consultants | 5/3/2011 | 1729 | $10,000.00 |
| CAREFIRST | PET Consultants | 5/17/2011 | 1737 | $30,000.00 |
| CAREFIRST | PET Consultants | 6/1/2011 | 1738 | $20,000.00 |
| CAREFIRST | PET Consultants | 8/10/2011 | 1780 | $34,000.00 |
| Total | | | | $161,300.00 |

45. CW2 stated that that the checks written to EMILITZA ARIAS sometimes had
    a comment stating, "marketing" or "consulting." CW2 stated that E.A. never
    worked for GUNABALAN in any capacity.

46. At the time these checks were written, EMILITZA ARIAS was a 24 year old
    high school graduate with no specialized training in any medical or business
    field. EMELITZA ARIAS worked for a short time as a Medical Assistant, but
    had no formal training as a Medical Assistant.

## AMERICAN WHOLESALE PHARMACEUTICALS

47. On May 23, 2011, GUNABALAN signed the Articles of Incorporation of AMERICAN, listing himself as the Registered Agent and sole Incorporator of AMERICAN. This form showed the address of the registered office to be 17200 East 10 Mile Road, Suite 114, Eastpointe, Michigan. GUNABALAN subsequently submitted, or caused to be submitted, these Articles of Incorporation to the State of Michigan on behalf of AMERICAN, in order to conduct business as a Domestic Profit Corporation. AMERICAN was issued a Manufacturer/Wholesaler pharmaceutical license by Michigan Department of Licensing and Regulatory Affairs.

48. A signature card for AMERICAN's Huntington National Bank account number ######5381, dated September 2, 2011, shows signatures of GUNBALAN as "President/Owner/CEO" and RALPH BINGGESER as "VP/CFO." The address used for AMERICAN on Huntington #######5381 was 363 West Big Beaver Road, Suite 200, Troy, Michigan.

49. On September 29, 2011, GUNABALAN opened a mailbox on behalf of AMERICAN at The UPS Store, 55 East Long Lake Road, #98, Troy, Michigan. To open the mailbox, GUNABALAN provided a copy of his Michigan driver's license and voter identification card. A receipt for Mailbox #98 was found during the execution of a search warrant at ARIAS' house along with a receipt from The UPS Store, 55 East Long Lake, Mailbox #96, belonging to ARIAS' wife. The receipts were both dated October 4, 2011, at 10:55 a.m. and 10:54 a.m. respectively.

50. CW1 stated that GUNABALAN, ARIAS, and Individual 3 entered into a business partnership at AMERICAN. AMERICAN distributed non-controlled prescription drugs to pharmacies on the East Coast. The

15

prescription drugs were obtained through Individual 3 who purchased the diverted, unused prescription drugs from senior citizens and adult foster care residents in Florida, New York, and Michigan, many of whom were Medicare beneficiaries. (I don't know that we can say that about Medicare benes. It makes sense, but I can't find it in a report.) AMERICAN only moved prescription drugs that did not have a generic version.

51. CW1 stated that ARIAS told GUNABALAN about the scheme and GUNABALAN said that this would be easy. CW1 believed that GUNABALAN knew AMERICAN was "bullshit." ARIAS and GUNABALAN talked about how to split the money and that the profits from AMERICAN would be deposited into the Huntington bank account and then wired to Mexico for laundering purposes.

52. CW3 was introduced to ARIAS by Individual 3. CW3 owned a wholesale pharmaceutical distribution company in the Detroit Metro area which obtained non-controlled diverted prescription drugs, re-labeled, and re-sold the prescription drugs to pharmacies in Michigan and the Eastern United States.

53. CW3 showed ARIAS how to "clean" the prescription drugs to remove any residue from pharmacy labels and make fraudulent drug pedigree statements for the prescription drugs. CW3 allowed AMERICAN to use one of his salespeople, CW4, to sell AMERICAN's prescription drugs.

54. ARIAS introduced CW3 to his business partner in AMERICAN, an Indian male. CW3 identified a photograph of GUNABALAN as ARIAS' business partner. CW3 spoke with GUNABALAN about the wholesale cost of prescription drugs and the profit margins in the pharmaceutical business. CW3 stated that based on the conversations he had with GUNABALAN, he

16

believed that ARIAS had already explained the scheme in its entirety to
GUNABALAN. CW3 stated that he believed GUNABALAN knew the
prescription drugs were obtained illegitimately because the profit margins
were too high to be legitimate.

55. CW3 was introduced to GUNABALAN's son, who is a pharmacist and
pharmacy owner. CW3 stated that since GUNABALAN's son was in the
pharmacy business, GUNABALAN would know the standard pharmacy
margins and know that the profit margins were too high with AMERICAN to
be legitimate.

56. Agents from the Federal Bureau of Investigation interviewed CW4. CW4
stated that CW3 told him that there was a doctor investor in Detroit who
wanted to branch into pharmaceutical wholesaling. The investor in Detroit
was going to supply the money for the enterprise, while the product would be
supplied by CW3. CW3 stated that AMERICAN's product was supplied by
Individual 3 or others associated with Individual 3.

57. CW4 stated that one of AMERICAN's investors was an Indian doctor named
"Ram." CW4 never met "Ram" in person; however, he spoke to "Ram" on the
phone one time using CW3's telephone. The conversation was brief and
centered on CW4 becoming the salesperson for AMERICAN. CW4 stated
that the telephone conversation occurred sometime before the first sale was
brokered to Pharmacy 1 in October 2011.

58. A review of GUNABALAN's telephone records corroborate CW4's
statement that contact occurred. On September 21, 2011, there was a two
minute phone call from GUNABALAN's cellular phone, ###-###-2734, to a
cellular phone number used by CW3.

17

59. CW4 brokered two deals for AMERICAN with Pharmacy 1. After the first deal, ARIAS did not want to pay CW4's sales commission. However, on October 21, 2011, CW4 received $8,735.92 as a wire transfer from AMERICAN's Huntington bank account. CW4 was not directly paid for the second sale to Pharmacy 1. Instead, the Supplier, who was suspected to be working with Individual 3, forgave a debt that CW4 owed to him.

/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/
/

60. A review of Huntington National Bank financial records for AMERICAN show that AMERICAN received the following payments from pharmacies for purchases of prescription drugs.

| Pharmacy | Check Date | Amount |
| --- | --- | --- |
| Pharmacy 1 | 10/11/2011 | $ 97,254.74 |
| Pharmacy 2 | 10/13/2011 | $ 14,551.58 |
| Pharmacy 2 | 10/14/2011 | $ 6,642.67 |
| Pharmacy 2 | 10/14/2011 | $ 2,694.32 |
| Pharmacy 1 | 10/18/2011 | $ 97,254.74 |
| Pharmacy 1 | 10/25/2011 | $ 23,681.37 |
| Pharmacy 3 | 11/1/2011 | $ 25,335.02 |
| Pharmacy 1 | 4/11/2012 | $ 90,702.88 |
| Pharmacy 1 | 4/17/2012 | $ 90,702.87 |
| Pharmacy 1 | 4/25/2012 | $ 90,702.88 |
| Pharmacy 1 | 5/9/2012 | $ 90,702.87 |
| Pharmacy 1 | 5/11/2012 | $ 90,702.88 |

61. CW1 stated that ARIAS said all of the checks from the pharmacies to AMERICAN were taken to BINGGESER, who deposited the checks into AMERICAN's bank account.

62. CW1 stated that the money from the pharmaceutical business was distributed in the following manner: Individual 3 received payment for the cost of supplying the prescription drugs plus 50% of the profit from the sale, GUNABALAN received 25% of the profit, and ARIAS received 25% of the profit.

63. CW3 stated that ARIAS discussed how the prescription drugs were purchased from patients on the street for approximately 20% of their value. The prescription drugs were then sold to pharmacies at 100% value, resulting in a substantial profit. ARIAS and Individual 3 described having a pharmaceutical license was like having a money machine.

64. Early in the scheme, Individual 3 was paid via wire transfers from AMERICAN's Huntington bank account to a Citibank bank account. On October 21, 2011, AMERICAN wired $92,547.22 the Citibank account. On October 25, 2011, AMERICAN wired another $90,000.000 to the Citibank account. On November 10, 2011, AMERICAN wired $20,642 to the Citibank account.

65. CW1 stated that the bank account in Mexico used by ARIAS to launder the proceeds from ELITE was the same bank account used by AMERICAN to pay Individual 2.

66. On March 19, 2012, Individual 3 incorporated F.C.G. using an alias, K.M., listing a business address of 55 E Long Lake Road, Ste 496, Troy, Michigan. The form also showed the purpose of the business "to provide financial and management advice." The UPS Store at 55 E Long Lake Road did not have

20

any records of K.M., Individual 3, or F.C.G. renting or using Mailbox 496 or any other Mailbox at that location. F.C.G. does not have a pharmaceutical wholesaler license through Michigan Department of Licensing and Regulatory Affairs.

67. After Individual 3 incorporated F.C.G., all payments to the supplier were made by business checks drawn on the AMERICAN account at Huntington. The checks were not deposited into a bank account. The checks were cashed at various money service businesses in the Miami, Florida area, where Individual 3 is known to reside.

68. Two representative series of transactions are outlined below.

| Date | Entity | Deposit | Withdrawal |
|------|--------|---------|------------|
| 4/12/2012 | Pharmacy 1 | $90,702.88 | |
| 4/13/2012 | ARIAS | | $7,000.00 |
| 4/17/2012 | MRI Consultants | | $6,605.42 |
| 4/18/2012 | F.C.G. | | $77,096.45 |
| 4/18/2012 | Pharmacy 1 | $90,702.87 | |
| 4/19/2012 | ARIAS | | $6,802.72 |
| 4/20/2012 | F.C.G. | | $77,097.44 |
| 4/24/2012 | GUNABALAN | | $6,802.72 |

69. Agents from the Federal Bureau of Investigation and Food and Drug Administration Office of Criminal Investigation interviewed the Chief Operating Officer of Pharmacy 1 in Massachusetts. Pharmacy 1 split the payment for sales orders into multiple payments of approximately equal amounts. Pharmacy 1 requested a drug pedigree statement from AMERICAN.

70. Your affiant reviewed the drug pedigree statement send to Pharmacy 1, dated May 16, 2012. The drug pedigree statement stated that AMERICAN had

21

obtained Truvada, Zyprexa, Isentress, Atripla, Epzicom, Sustiva, and Abilify from Omnicare, Inc. on March 21, 2012. ARIAS did not produce the drug pedigree statement for AMERICAN, because ARIAS was arrested on May 2, 2012, and was in federal custody at that time.

71. Your affiant contacted Omnicare, Inc regarding the information contained in the drug pedigree statement provided to Pharmacy 1. A representative from Omnicare stated that Omnicare is primarily a retail pharmacy, and as such infrequently sells any prescription drugs to other entities. Omnicare did not have a record of any sales to AMERICAN, DR. GUNABALAN, ARIAS or any other individuals associated with AMERICAN. Omnicare did not have a record of any sales of the lot numbers identified on the drug pedigree statement.

72. Pharmacy 1 purchased the prescription drugs listed below from AMERICAN between October 2011 and April 2012. Orders were dated October 3, 2011, October 13, 2011, and April 5, 2012.   During the time period of the purchases and four months after the last purchase (October 2011 to August 2012), Pharmacy 1 dispensed 69,620 prescriptions to 1,427 Medicare beneficiaries, totaling $17,683,492. Between October 2011 and August 2012, Pharmacy 1 dispensed prescription drugs of the same name and dosage to Medicare beneficiaries.

| Drug | Quantity Purchased | Quantity Dispensed | Medicare Payments |
|---|---|---|---|
| ABILIFY 10 mg | 600 | 1442 | $ 27,727.16 |
| ABILIFY 15 mg | 600 | 1128 | $ 21,689.04 |
| ABILIFY 5 mg | 90 | 1725 | $ 32,109.52 |
| ATRIPLA | 3630 | 6317 | $ 375,241.26 |
| CELEBREX 100 mg | 100 | 1275 | $ 3,705.16 |
| CELEBREX 200 mg | 1100 | 4765 | $ 21,472.84 |
| COMBIVIR | 180 | 1200 | $ 18,235.77 |
| CYMBALTA 30 mg | 30 | 2444 | $ 14,490.88 |
| CYMBALTA 60 mg | 420 | 4162 | $23,992.25 |
| DIOVAN | 90 | 3584 | $ 12,065.97 |
| EPZICOM | 990 | 5467 | $ 182,248.46 |
| GEODON 60 mg | 120 | 360 | $ 3,667.29 |
| GEODON 80 mg | 300 | 1537 | $ 15,495.40 |
| INTELENCE | 240 | 9104 | $ 63,221.57 |
| ISENTRESS | 4740 | 25404 | $ 443,088.73 |
| KALETRA | 2280 | 10440 | $ 65,480.17 |
| LEXIVA | 720 | 8144 | $ 109,665.92 |
| MEPRON | 1050 | 7950 | $ 42,905.74 |
| NAMENDA | 240 | 15683 | $ 57,551.47 |
| NORVIR | 3330 | 8255 | $ 73,538.59 |
| PLAVIX | 270 | 13699 | $ 90,903.64 |
| PREZISTA 400 mg | 3960 | 8728 | $ 154,603.51 |
| PREZISTA 600 mg | 2640 | 7546 | $ 131,749.57 |

23

| | | | |
|---|---|---|---|
| REYATAZ 200 mg | 300 | 2866 | $ 49,011.42 |
| REYATAZ 300 mg | 300 | 6945 | $ 231,767.32 |
| SELZENTRY | 120 | 1020 | $ 17,523.26 |
| SEROQUEL | 480 | 1658 | $ 25,828.98 |
| SINGULAIR | 450 | 7612 | $ 40,846.20 |
| SUSTIVA | 210 | 2610 | $ 51,967.59 |
| TRIZIVIR | 240 | 718 | $ 17,463.84 |
| TRUVADA | 7680 | 20693 | $ 817,418.72 |
| VIRACEPT | 120 | 1440 | $ 9,289.97 |
| VIRAMUNE | 240 | 2840 | $ 28,849.80 |
| VIREAD | 390 | 2200 | $ 57,721.47 |
| ZIAGEN | 120 | 5666 | $ 53,354.86 |
| Total | 38,370 | 206,627 | $ 3,385,893.34 |

73. Your affiant was unable to locate any invoices for orders involving Pharmacy 2, located in Pennsylvania. However, in the three months after checks from Pharmacy 2 were deposited by AMERICAN, Pharmacy 2 dispensed 7,323 prescriptions to 624 Medicare beneficiaries, totaling $617,211.

74. Pharmacy 3, located in Pennsylvania, purchased the prescription drugs listed below from AMERICAN on October 20, 2011. In the three months following the purchase, Pharmacy 3 dispensed 6,658 prescriptions to 289 Medicare beneficiaries, totaling $709,948. In the three months following the purchase, Pharmacy 3 dispensed prescription drugs of the same name and dosage to Medicare beneficiaries.

| Drug | Quantity Purchased | Quantity Dispensed | Medicare Payments |
|---|---|---|---|
| EPIVIR 150 mg | 60 | 180 | $ 1,247.39 |
| EPIVIR 300 mg | 60 | 0 | - |
| EPZICOM | 90 | 450 | $ 14,377.03 |
| NORVIR | 330 | 1950 | $ 17,481.70 |
| TRUVADA | 600 | 1770 | $ 67,391.07 |
| Total | 1140 | 4350 | $ 100,497.19 |

75. On May 2, 2012, ARIAS was arrested for Health Care Fraud by Agents of the Federal Bureau of Investigation and Department of Health and Human Services Office of Inspector General. After ARIAS' arrest, Agents seized a check from AMERICAN's Mailbox at the UPS Store from Pharmacy 1 for $90,702.87. After ARIAS' arrest, an individual from AMERICAN contacted Pharmacy 1 to have them re-issue the check. Pharmacy 1 re-issued the check, which was deposited into AMERICAN's bank account.

76. After the last check from Pharmacy 1 was deposited into AMERICAN's account, a series of financial transactions occurred to move the remaining money out of AMERICAN's account, leaving a balance of $442.35. None of the money was given to ARIAS, as he was in federal custody. BINGESSER wrote a series of checks to F.C.G., and $30,000.00 was transferred to GUNABALAN's MRI Consultants bank account.

| To | From | Date | Check # | Amount |
|----|------|------|---------|--------|
| AMERICAN | Pharmacy 1 | 5/10/2012 | | $90,702.87 |
| F.C.G. | AMERICAN | 5/14/2012 | 1025 | 77097.43 |
| AMERICAN | Pharmacy 1 | 5/14/2012 | | $90,702.88 |
| MRI Consultants | AMERICAN | 5/16/2012 | Online Transfer | $30,000.00 |
| F.C.G. | AMERICAN | 5/18/2012 | 1028 | $25,097.44 |
| F.C.G. | AMERICAN | 5/21/2012 | 1026 | $26,000.00 |
| F.C.G. | AMERICAN | 5/21/2012 | 1027 | $26,000.00 |

77. Cooperating Witnesses CW1, CW2, CW3, and CW4 have provided information to federal agents which has been deemed reliable and accurate.

## CONCLUSION

78. As stated in Title 18, United States Code, Section 1956 (h), any person who conspires to commit any offense set forth in 1956 or 1957 shall be sentenced up to twenty years in prison and or up to $500,000 in fines.

79. As stated in Title 18, United States Code, Section 1956(a)(1)(B), whoever knowing that the transaction is designed in whole or part to conceal or disguise the nature, the location, the source, the ownership or control of the proceeds of a specified unlawful activity shall be sentenced to up to twenty years in prison and or fined up to $500,000 or twice the amount laundered.

80. As stated in Title 18, United States Code, Section 1957, whoever knowingly engages, or attempts to engage, in a monetary transaction in criminally derived property that is of a value greater than $10,000.00 and is derived from specified unlawful activity by, through, or to a financial institution shall be sentenced up to ten years in prison or a fine of not more than twice the amount of criminally derived property involved in the transaction.

81. The specified unlawful activity is health care fraud, in violation of Title 18, United States Code, Section 1347.

82. GUNABALAN laundered money for ARIAS by accepting cash from ARIAS in exchange for checks drawn on GUNABALAN's business accounts. The cash was the proceeds from ARIAS' health care fraud at ELITE. The proceeds from ELITE were laundered through Mexico and Panama and returned to the United States and ARIAS in the form of cash.

83. GUNABALAN wrote EMELITZA ARIAS a series of checks, drawn on R. Gunabalan Inc's Huntington bank account, totaling $250,000 in exchange for the cash from the ELITE proceeds.

84. EMILITZA ARIAS received a series of checks from GUNABALAN's business entity, PET Consultants, totaling $250,000.00 in exchange for cash from the ELITE proceeds.

85. As stated in Title 21, United States Code, Section 331(a), whoever introduces or delivers for introduction into interstate commerce any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded shall be sentenced up to three years in prison or fined $10,000 or both.

86. As stated in Title 21, United States Code, Section 331(b), whoever adulterates or misbrands any food, drug, device, tobacco product, or cosmetic in interstate commerce shall be sentenced up to three years in prison or fined

27

$10,000 or both.

87. GUNABALAN, through AMERICAN, caused misbranded prescription drugs to enter interstate commerce by purchasing the prescription drugs from an unlicensed, illegitimate source. On at least one occasion, a fraudulent drug pedigree statement was created and transmitted to a Medicare-participating pharmacy.

88. As stated in Title 18, United States Code, Section 1347, whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice to defraud any health care benefit program, including Medicare, or who obtains, by means of false and fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of any health care benefit program shall be sentenced up to ten years in prison and or up to $250,000 in fines.

89. As stated in Title 18, United States Code, Section 1349, whoever attempts or conspires to commit health care fraud shall be subject to the same penalties as those prescribed in the offense.

90. GUNABALAN, ARIAS, and others entered into a conspiracy to sell diverted prescription drugs to pharmacies. The prescription drugs were obtained by illegitimate means by Individual 3, re-labeled, and re-sold to unsuspecting pharmacies in Massachusetts and Pennsylvania.

91. GUNABALAN committed health care fraud by distributing diverted, misbranded prescription drugs to Medicare participating pharmacies. GUNABALAN caused the pharmacies to dispense the prescription drugs to Medicare beneficiaries, make claims to Medicare for the dispensed prescription drugs, and receive reimbursement for the dispensed prescription drugs. Medicare does not reimburse for misbranded or diverted prescription

28

drugs.

92. As stated in Title 18, United States Code, Section 482, whoever, within the United States with the intent to defraud, falsely makes, alters, forges, or counterfeits any bank note or bill issued by a bank or corporation of any foreign country, and intended by the law or usage of such foreign country to circulate money, such bank or corporation being authorized by the laws of the United States, shall be imprisoned up to twenty years and or fined up to $250,000.

93. In 2011, GUNABALAN attempted to use a stolen bond issued by the Republic of Venezuela as collateral for a $25 million loan from UBS.

94. GUNABALAN used the mails to pay for a $5,000,000 life insurance policy on DOCTOR-2.   GUNABALAN attempted to induce RAYMOND ARIAS to murder a former business partner, DOCTOR-2.

//

//

//

//

//

//

//

//

//

//

//

//

//

95. Based upon the foregoing, your affiant submits that probable cause exists that RAMASAMI GUNABALAN has committed violations of Title 18, United States Code, Section 1956 and 1957, Money Laundering, Title 21, United States Code, Section 331(a) and 331(t), Food, Drug, and Cosmetic Act,   Title 18, United States Code, Sections 1347 and 1349, Health Care Fraud, and Title 18, United States Code, Section 482, Unauthorized Use of Foreign Bank Notes, and respectfully requests that an arrest warrant be issued for RAMASAMI GUNABALAN.


Larissa Kramer
Special Agent
Federal Bureau of Investigation



Sworn to and subscribed to before me this 25th day of June, 2014.

Mona K. Mazjoub
United States Magistrate Judge
Detroit, Michigan

30